Filed 12/29/14  Crowe v. Tweten CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

NANCY CROWE et al.,

     Plaintiffs, Objectors and Respondents,

v.

LEONARD M. TWETEN,

     Objector, Cross-complainant and Appellant.

E058311

(Super.Ct.No. INP0000515)

OPINION

APPEAL from the Superior Court of Riverside County.  James A. Cox, Judge.

Affirmed in part, reversed in part, remanded with directions.

Bingham McCutchen, Marshall B. Grossman and Karen Ho; Orrick, Herrington & Sutcliffe and Marshall B. Grossman; Ervin Cohen & Jessup, Rodney C. Lee and Jeffrey A. Merriam-Rehwald; Morrison & Foerster, Miriam A. Vogel and Jacob M. Harper for Objector, Cross-complainant and Appellant.

Loeb & Loeb, Adam F. Streisand and David C. Nelson for Plaintiffs, Objectors and Respondents.

1

This is the second appeal from an action involving a dispute concerning the validity of an amendment to, and/or the need to reform, a trust executed by Leonard M. and Eileen Tweten in 2008.[1]  Following a court trial, the trust was reformed to comply with the language in the amendment and judgment was entered in favor of objector, cross-complainant and appellant Leonard M. Tweten, who then brought a motion pursuant to Code of Civil Procedure section 2033.420[2] seeking cost-of-proof sanctions against plaintiffs, objectors, and respondents Nancy Crowe and Janet Houston (collectively, plaintiffs) based on their denials of certain requests for admission.  The trial court denied the motion and Leonard appeals.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

Leonard and Eileen had four children:  Jim, Scott (deceased),[3] Nancy, and Janet.[4]  In 2008 the Twetens executed the LET Revocable Trust (Trust).[5]  According to its terms,

---

[1]  On our own motion, we take judicial notice of the record and our opinion in plaintiffs' first appeal (*Nancy Crowe et al. v. Leonard M. Tweten*, case No. E056920 [nonpub.opn.].)  (Evid. Code § 452, subd. (d) [permissive judicial notice of court records].)  The relevant facts herein are taken from our opinion in case No. E056920 (hereafter, E056920) which is filed concurrently with this opinion.

[2]  All further statutory references are to Code of Civil Procedure.

[3]  Scott suffered from alcoholism, which caused his death in 2010.

[4]  Because of the family relationship of the parties, we adopt their practice and refer to them by their first names.  No disrespect is intended.

[5]  The Trust was drafted by Best, Best, & Krieger attorney Joseph Hahn after the Twetens consulted with their financial advisor, Matthew McCutchen of the McCutchen Group.

2

at the first death, the Tweten estate would be split in half (two estimated $50 million community property shares); a small amount from the deceased spouse's share (shown on the diagram attached to E056920 as Exhibit No. 1 as $1 million) would be divided equally among the four children via a "family trust" and would be distributed to them immediately. If Eileen died first, a small amount[6] would be divided equally among the four children and the remainder of her share ($49 million) would be held in a "marital trust" for Leonard's benefit; if Leonard died first, a small amount would be divided equally among the four children; then $5 million would go to a foundation, and the remainder of his share ($44 million) would be held in a marital trust for Eileen's benefit. The surviving spouse would receive the income from the marital trust and also would have access to the principal for specified purposes. Only at the death of the surviving spouse would the estate be distributed to the children. And even after that death, Leonard's share would pass to the children in trust. Under no circumstances would Scott inherit his share of the trust outright.[7]

In April 2010, when Eileen began hospice care, the financial advisors for the Twetens realized the Trust needed to be amended to ensure that it effectuated their intent to leave only a token amount to the children upon the first death, and the bulk of the

---

**6** The small amount was set based on the federal estate tax (FET) exemption, which was $2 million in 2008 and $3.5 million in 2009. However, it was slated to expire in 2010 (i.e, the FET exemption amount would be 100 percent).

**7** The Twetens did not want Scott to receive the same full outright share as their other children at any point in time because "they both felt that giving him additional money due to his health issues would go ahead and just basically potentially kill him."

deceased spouse's share to a marital trust for the surviving spouse's benefit. They

realized that because of the absence of an FET in 2010, the entire share of the deceased

spouse would go into the family trust for immediate distribution to the children, leaving

nothing to be deposited in the marital trust. Thus, an amendment[8] was drafted that

directed everyone to "[r]ead the trust as if this was a 2009 trust so that it wasn't 2010

with no [FET]." Leonard signed the amendment and then presented it to Eileen, who also

signed it.

Following Eileen's death, plaintiffs petitioned the court in September 2010 to

invalidate the amendment on grounds of fraud, undue influence, forgery, lack of capacity,

and invalidity because the signatures were not notarized. Jim did not join his sisters'

petition. Leonard also petitioned the court, asking that the court modify or reform "the

provisions of the Trust to provide that Eileen's share of the Trust be divided following

her death so that the Family Trust be funded with $2,500,000 and the residue of Eileen's

property be funded into the Marital Trust."

By August 2011, plaintiffs had deposed and obtained documents from a number of

key witnesses, including Attorney Joseph Hahn, who drafted the Trust, Attorney David

Erwin, who prepared the amendment and was present when the Twetens signed it, the

family's financial manager, Matthew McCutchen, who also witnessed the Twetens

execute the Trust and the amendment, and the nurse, Cheryl Readinger, who cared for

---

[8] "This Trust during the year 2010 in the event of death of one of the Grantors is amended throughout to provide distribution, administration and allocation based upon the Federal Estate and Generation-Skipping Transfer tax law as the same existed and would have been applicable to estate of decedents dying during the year 2009."

4

Eileen during her terminal illness. A number of experts, including forensic psychiatrist Dr. James Spar, had already been consulted by the plaintiffs and their lawyers. None of the deposition testimonies of the witnesses supported plaintiffs' claims.

On July 27, 2011, Leonard served requests for admission, asking plaintiffs to admit (1) that the signature appearing on the amendment was Eileen's and not a forgery; (2) that Eileen was not mentally incapacitated when she signed the amendment; (3) that Eileen's signature on the amendment was not the product of Leonard's undue influence; and (4) that if she died first, Eileen wanted Leonard to receive the income from the majority of her assets. On September 6, 2011, after completion of percipient witness depositions and other discovery, plaintiffs responded to all of the requests for admission with boilerplate objections followed by one word: "Denied."

Following a bench trial, the court issued a detailed tentative decision, wherein it found in favor of Leonard and against plaintiffs. Specifically, the court rejected the opinion of the plaintiffs' handwriting expert, William Leaver, finding that he had relied on incorrect information in forming his opinion about the legitimacy of Eileen's signature on the amendment.[9] The court noted that plaintiffs' own expert, Dr. Spar, "concluded that at the time of the signing of the amendment, the decedent had testamentary and decisional capacity." Finding no undue influence, the court concluded the evidence

---

[9] "It is clear from Leaver's testimony, that his opinion as to the signature's validity was very greatly influenced by his belief that the decedent was 'near death' and was 'two days before coma' at the time of execution. The information, underlying Leaver's belief, was incorrect, and was relayed to the expert by daughter's counsel at the time the expert was retained."

failed to support plaintiffs' claim that Eileen wanted to change the trust to deprive Leonard of his share. The trial court observed that "the evidence is most convincing that the trust failed to comply with the settlor's intended distributions upon the death of either settlor if such death happened to occur in the year 2010." Unable to enforce the amendment because the signatures of the Twetens had not been notarized (*King v. Lynch* (2012) 204 Cal.App.4th 1186, 1193), the court used its equitable power to reform, and, alternatively, modify the Trust to add the language in the amendment in order to give effect to the consistent intent of the Twetens "that the trust provide a marital trust for the use of the survivor." Judgment was entered on August 7, 2012.

On September 13, 2012, Leonard filed a motion under section 2033.420.[10] Plaintiffs' opposition to the motion claimed they had a "reasonable ground to believe they would prevail on the issue." (Capitalization omitted.) They maintained they had a good faith basis for their denials based on "documents, deposition testimony, anticipated expert testimony, and legal arguments . . . ." Denying the section 2033.420 motion, the trial court noted that plaintiffs' opposition pointed "to much evidence (including deposition testimony) that they reasonably believed would support their denial of the admissions, and would assist them in prevailing at trial. It is clear that they believed they would prevail, and that this belief was in good faith. The fact that the responding parties were ultimately proven wrong at the time of trial, does not change their belief that they

---

[10] Leonard served the requests for admission on July 27, 2011, and plaintiffs verified their responses on September 2, 2011.

would prevail, and that they had sufficient evidence to support their position, and, hence, their denials of the requests for admissions."

## II. LEGAL PRINCIPLES

### A. Governing Law

Any party may obtain discovery by a written request that the other party admit "the truth of specified matters of fact, opinion relating to fact, or application of law to fact. A request for admission may relate to a matter that is in controversy between the parties." (§ 2033.010.)

"Requests for admissions differ fundamentally from other forms of discovery. Rather than seeking to uncover information, they seek to eliminate the need for proof. [Citation.]" (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 [Fourth Dist., Div. Two].) Requests for admissions expedite the trial. (*Id*. at p. 865.) "A party responding to requests for admissions has a duty to make a reasonable investigation to ascertain the facts even though the party has no personal knowledge of the matter when the party has available sources of information as to the matters involved in such requests for admissions. [Citation.]" (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 510 (*Brooks*).[11])

---

[11] In *Brooks*, a truck/semitrailer rig lost control and hit a tree. (*Brooks*, *supra*, 179 Cal.App.3d at p. 505.) The truck driver sued the driver of a bus and his employer, alleging that the accident was caused by the bus driver crossing over the centerline of the road. (*Id*. at p. 506.) At trial, the jury found in favor of defendant bus driver, who moved for cost-of-proof sanctions on the grounds the truck driver refused to admit that he, not the bus driver, had crossed the line. (*Id*. at pp. 506-507.) The trial court awarded sanctions for refusing to admit that the truck was over the line, but denied them for

*[footnote continued on next page]*

7

"Under Code of Civil Procedure section 2033.420, a party that denies a request for admission may be ordered to pay the costs and fees incurred by the requesting party in proving that matter." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1276 (*Laabs*) [Fourth Dist., Div. Two].) Allowing recovery of expenses "is directly related" to the purpose underlying requests for admissions—to expedite trial. (*Brooks*, *supra*, 179 Cal.App.3d at p. 509.) "Unlike other discovery sanctions, an award of expenses pursuant to section [2033.420] is not a penalty. Instead, it is designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission . . . such that trial would have been expedited or shortened if the request had been admitted." (*Ibid.* [discussing predecessor provision].)

While recovery of costs is not contingent upon success of the action, costs of proof "are not recoverable simply because the party promulgating the request prevails at trial." (*Brooks*, *supra*, 179 Cal.App.3d at p. 513.) There are limits on section 2033.420's application. As provided in subdivision (a), the statute applies only where the propounding party later proves the matter at issue in the request for admission. (§ 2033.420, subd. (a); *Stull v. Sparrow*, *supra*, 92 Cal.App.4th at p. 864.) As provided in

---

*[footnote continued from previous page]*
refusing to admit that the bus was not. (*Id.* at pp. 512-513.) The appellate court affirmed both rulings for the following reasons: Regarding the truck being over the line, the truck driver's denial was unreasonable after the Highway Patrol issued its report that concluded the truck was over the line given the tire marks made on the pavement. (*Id.* at p. 512.) Regarding the bus being over the line, the denial was reasonably given the consistent testimony of one witness (the truck driver's father) who stated that he saw the bus over the line. (*Id.* at p. 513.) Thus, according to *Brooks*, absent credible evidence, a denial of a request for admission is subject to cost-of-proof sanctions. (*Id.* at pp. 512-513.)

section 2033.420, subdivision (b), there are four explicit exceptions to the statute's application: (1) where an objection to the requested admission has been sustained or a response waived (§ 2033.420, subd. (b)(1)); (2) where the requested admission was not of substantial importance at the time of the response (*id*., subd. (b)(2)); (3) when the party denying the request for admissions had a reasonable belief in prevailing on the disputed matter (*id*., subd. (b)(3)); and (4) where the responding party had some other good cause for denying the request for admission (*id*., subd. (b)(4)).

## B. Standard of Review

The trial court's ruling on a section 2033.420 motion is reviewed for an abuse of discretion. (*Miller v. American Greetings Corp.* (2008) 161 Cal.App.4th 1055, 1066 (*Miller*).[12]) "The determination of whether 'there were no good reasons for the denial,' whether the requested admission was 'of substantial importance,' and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court.

---

[12] In *Miller*, a plaintiff had been hit by the driver of a pickup truck. The injured plaintiff and her husband sued the driver and his employer, American Greetings Corporation. As part of his employment, the driver worked from his home and car and relied on his cell phone to conduct business. (*Miller, supra,* 161 Cal.App.4th at p. 1061.) On the day of the accident, however, he had taken the day off work. (*Ibid*.) American Greetings Corporation requested that the plaintiffs admit that the driver was not acting within the course and scope of his employment at the time of the accident. (*Id.* at pp. 1058-1059.) The plaintiffs denied the request. The trial court found that the denial was unreasonable and awarded fees to the defendants. (*Id.* at p. 1061.) In finding that the award was an abuse of discretion, the appellate court explained: "Because the law involving 'mobile' offices inside an employee's car is unsettled, appellants could have reasonably entertained a good faith . . . belief that they could prevail here under respondeat superior." (*Id.* at p. 1066.) In the case at bar, the requests did not call for the application of unsettled law.

9

[Citation.]  By contrast, if the trial court exercises its discretion and determines that the requirements of the statute exist, reasonable expenses *must* be awarded.  [Citation.]  On appeal, the trial court's decision will not be reversed unless the appellant demonstrates that the lower court abused its discretion." (*Brooks*, *supra*, 179 Cal.App.3d at p. 508.)

### III.  ANALYSIS

In making the determination as to whether a request for admission was unreasonably denied, the trial court generally assesses the situation at the time the request was denied.  (*Brooks*, *supra*, 179 Cal.App.3d at pp. 509-510.)  Factors to be taken into consideration in making this determination, include:  (1) was the fact sought to be admitted of substantial importance at the time the request was made; (2) the extent to which the information sought to be admitted was within the personal knowledge of the responding party; (3) whether the necessary information to properly respond could have been gained through reasonable investigation; (4) did the responding party, in good faith, believe that he or she would prevail on the issue; (5) whether, following an initial denial, the responding party subsequently offered to admit the fact rather than requiring the propounding party to prove up the previously denied request for admission; and (6) at trial, did the responding party actually submit evidence relative to admission sought by way of the request.  (See *id.* at pp. 509-511; *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634-635.)

As Leonard pointed out to the trial court, he "asked for admissions . . . of the core factual issues in this case, testamentary intent, undue influence, four separate ones on forgery, and testamentary capacity."  The requests for admission that were the subject of

10

Leonard's section 2033.420 motion are discussed based on the parties' presentation and argument at the trial level.

## A. Eileen's Intent

"REQUEST FOR ADMISSION NO. 10:  [¶]  Admit that EILEEN wanted LEN to receive the income from the majority of her assets after her death and during his lifetime as her survivor."

Request for admission No. 10 sought an admission that Eileen intended to leave the majority of her assets after her death and during his lifetime to Leonard.  According to Leonard, each of the percipient witnesses testified that both Eileen and Leonard were consistent in their intent to establish a lifetime benefit for the surviving spouse.  In response, plaintiffs argued that their denial was supported by the language in the Trust, along with the deposition testimony of Attorney Hahn, who "understood that the Twetens wanted their trust to pass the maximum amount free of estate tax to their children at the first death," opined that the Twetens "understood that in 2010 there was no estate tax under the law as it existed at that time, and [affirmed] that as drafted in 2008, the trust was consistent with [their] intent."  Plaintiffs argued that the court's reliance on "Hahn's testimony to the contrary at trial is irrelevant."

Regarding the language in the Trust, the fact that in every year but 2010 Leonard would have received the income from the majority of Eileen's assets after her death and during his lifetime, belies plaintiffs' claim that they reasonably believed that they would prevail.  Regarding Hahn's deposition testimony, the record shows that plaintiffs are using it out of context.  The excerpts of Hahn's deposition attached to Leonard's motion

11

provide that Eileen was "very clear that she wanted the money to be available to [Leonard] while he was alive" even though she believed that the children should "get it outright." Hahn added that both Leonard and Eileen "wanted the full amount of the estate to be available to the surviving spouse. They didn't want to impact the survivor's lifestyle in any way." Hahn's deposition was taken on July 28, 2011. Additionally, on August 24, 2011, Matthew McCutchen testified that in September 2007, both Eileen and Leonard agreed that "when the first passed away, their assets would be available for the survivor." Furthermore, the existence of the amendment further supports a finding of the Twetens' desire to pass their assets to the surviving spouse.

At trial, plaintiffs failed to produce any witness regarding the Twetens' testamentary intent that contradicted that provided by Hahn and McCutchen. The trial court nonetheless denied Leonard's postrial section 2033.420 motion, finding plaintiffs "point[ed] to much evidence (including deposition testimony) that they reasonably believed would support their denial of the admissions, and would assist them in prevailing at trial. It is clear that they believed they would prevail, and that this belief was in good faith." We conclude, the trial court erred in finding, on this record, that plaintiffs had a reasonable basis for their denial of Eileen's testamentary intent. The evidence consistently showed Eileen's desire to pass her assets to Leonard for his use until his death. Thus, failure to award Leonard expenses incurred in proving her intent is an abuse of discretion. (*Wimberly v. Derby Cycle Corp.*, *supra*, 56 Cal.App.4th at pp. 636-637.)

12

**B. Eileen's Signature**

"REQUEST FOR ADMISSION NO. 1: [¶] Admit that EILEEN's signature to the AMENDMENT was not forged . . . ."

"REQUEST FOR ADMISSION NO. 3: [¶] Admit that LEN did not actively procure a forged signature to the AMENDMENT as alleged in Paragraph 16 of the PETITION. . . ."

"REQUEST FOR ADMISSION NO. 4: [¶] Admit that EILEEN signed the AMENDMENT."

"REQUEST FOR ADMISSION NO. 5: [¶] Admit that EILEEN's signature to the AMENDMENT was written by her own hand."

Requests for admission Nos. 1, 4, and 5 sought an admission that Eileen personally signed the amendment. Request for admission No. 3 sought an admission that Leonard did not actively procure a forged signature. Leonard's argument in support of his motion regarding the admission of these requests was short. He merely noted that three witnesses testified to being present when Eileen signed the amendment and that the trial court rejected plaintiffs' handwriting expert's [William Leaver] opinion on the grounds it failed to account for the fact that Eileen was in a reclining position with the amendment on her lap supported by one of her magazines and it "was tainted by [Leaver's] belief that Eileen was 'near death' and 'two days before coma' at the time of execution." In response, plaintiffs argued that their denial was supported by their familiarity with Eileen's signature, along Leaver's opinion that it was "highly probable" the signature was not Eileen's, and the possibility that it was forged, given the inability of

13

anyone who could account for the whereabouts of the original amendment taken from the Tweten home.

In evaluating whether a "good reason" exists for denying a request to admit, "a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial. [Citation.]" (*Brooks*, *supra*, 179 Cal.App.3d at p. 511 [interpreting, former § 2034].) Here, as to requests for admission Nos. 1, 4 and 5, plaintiffs were asked to admit that Eileen signed the amendment. While the trial court concluded that the signature was Eileen's, the fact that it had not been notarized prevented the court from upholding the amendment as valid. More importantly, plaintiffs were familiar with their mother's signature and they both opined that the signature on the amendment was not Eileen's. Their opinion was supported by that of their expert, Leaver, who opined that it was "highly probable" that the signature on the amendment was not Eileen's, along with Leonard's expert, Howard Rile, who agreed that the questioned signature did not look like Eileen's known contemporaneous signature. On this record, plaintiffs could have reasonably believed that they would prevail at trial. (*Brooks*, *supra*, 179 Cal.App.3d at p. 513.)[13] Therefore, the denial of Leonard's section 2033.420 motion with respect to the

---

[13] During oral argument, Leonard maintained there were no documents to support plaintiffs' claim that their mother's signature on the amendment did not resemble the signature that they were familiar with from her various correspondence with them. He pointed to the testimony of Eileen's hairdresser (regarding the checks she used to pay him for his services) and his expert, Mr. Riles (regarding his review of the checks Eileen signed based on proximity to the time she signed the amendment), and argued that such evidence shows that plaintiffs' denial of the requests regarding Eileen's signature was

*[footnote continued on next page]*

14

requests for admission concerning Eileen's signature was not an abuse of discretion. (*Laabs*, *supra*, 163 Cal.App.4th at p. 1276-1277.)

Turning to request for admission No. 3, this request addresses Leonard's actions with respect to Eileen's signature. Plaintiffs' sole support for their denial of this request is found in their expert's opinion that it was possible that the signature was forged, given the inability of anyone who could account for the whereabouts of the original amendment taken from the Tweten home. However, no person was ever identified as the person who procured the allegedly forged signature. Absent such evidence, plaintiffs' denial was unreasonable. Plaintiffs' accusation towards Leonard was based on nothing more than pure speculation. Thus, the failure to award Leonard expenses incurred in proving his innocence is an abuse of discretion.

## C. Eileen's Mental Capacity

"REQUEST FOR ADMISSION NO. 7: [¶] Admit that EILEEN was not mentally incapacitated on April 14, 2010."

Request for admission No. 7 sought an admission that Eileen had the mental capacity on April 14, 2010, to consent to the amendment. Leonard argued that plaintiffs'

---

*[footnote continued from previous page]*
unreasonable. However, Leonard failed to offer this evidence to the trial court in support of his motion. His counsel's invitation that the trial court "go broader than the motion and consider everything that the Court heard at trial and in pretrial proceedings" was declined. Moreover, such argument was not presented to this court during briefing. Thus, Leonard forfeited this contention by failing to timely raise it. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [We do not consider matters raised for the first time in the reply brief].)

15

own expert, Dr. Spar, opined that Eileen had the "testamentary and decisional capacity" at the time of the signing of the amendment. In response, plaintiffs relied on the facts that (1) Eileen's Advance Health Care Directive gave Leonard the legal authority to make medical decisions for her only if she lacked capacity; (2) on April 10, 2010, Leonard, not Eileen, executed the hospice forms suggesting she lacked the mental capacity to do so; (3) there was no evaluation of her mental capacity on April 14, 2010; and (4) plaintiffs found Eileen to be nonresponsive from April 18, 2010, until her death.

Plaintiffs retained Dr. Spar in May or June 2011. After reviewing hospice notes and deposition transcripts of witnesses present at the time Eileen signed the amendment, Dr. Spar acknowledged the hospice care notes from April 2010 which observed that Eileen may have had an "altered mental status" caused by pain medication. However, Dr. Spar concluded that Eileen's impaired state of mind had nothing to do with her mental capacity on April 14, 2010. He told plaintiffs, and later testified that the evidence was insufficient to support a conclusion that Eileen lacked testamentary capacity on April 14, 2010. Given Dr. Spar's expert opinion, it was not reasonable for plaintiffs to believe that Eileen lacked mental capacity, and the failure to award Leonard expenses incurred in proving Eileen's mental capacity is an abuse of discretion.

### D. Leonard's Undue Influence

"REQUEST FOR ADMISSION NO. 8: [¶] Admit that EILEEN's execution of the AMENDMENT was not the product of LEN's undue influence over her."

Request for admission No. 8 sought an admission that Leonard did not unduly influence Eileen into signing the amendment. Leonard pointed out that while Dr. Spar

16

opined that Eileen was "susceptible to undue influence," he also agreed that "mere susceptibility to undue influence does not mean that any undue influence actually occurred." He further noted that after finding the Twetens intended to fund a marital trust on the first death for the use and benefit of the surviving spouse, the court determined, "There was no undue benefit to be derived by the surviving settlor in the execution of the proposed amendment." In response, plaintiffs argued that Eileen was in a weakened state and susceptible to undue influence from Leonard who procured the amendment. They noted that Leonard was the one to procure the amendment when he called McCutchen to confirm that Eileen's estate would pass to him upon her death. Such telephone call resulted in the creation of the amendment, even though Eileen "never expressed any desire to amend the Trust, and no one told her anything about the amendment before it was presented to her for her signature," including the fact that if she died in 2010, "she could pass her entire net estate to her children free of any estate tax . . . ."

At trial, plaintiffs failed to produce any evidence that Leonard unduly influenced Eileen in signing the amendment. Their claim of undue influence primarily rests on the Leonard's telephone call to McCutchen (to confirm that Eileen's estate would pass to him upon her death), which "le[]d to the drafting of the amendment— *not* any request from Eileen." While Leonard's call prompted the financial advisors and lawyers of the Twetens to review the Trust in order to determine whether its language would accomplish the Twetens' intent, in no way does the call equate to undue influence. The need to amend the Trust was determined by the financial advisors and lawyers who represented *both* Leonard and Eileen. Only upon their determination that the Trust would not operate

17

to carry out Eileen's intent in the year 2010 did they decide to prepare the amendment. The Twetens were presented with the amendment and signed it on the advice of their financial advisors and lawyers.

On appeal, plaintiffs emphasize Eileen's weakened condition, hospice care paperwork which indicated she was bedbound, required total care, and suffering from an "altered mental status," along with their expectation that Dr. Spar would opine that she was susceptible to undue influence. However, according to the evidence at trial, neither of the Twetens ever tried to influence the other regarding their distribution of their assets despite their disagreement on how their estate should be finally distributed. (E056920) Plaintiffs' reliance on *Estate of Davison* (1967) 256 Cal.App.2d 807 is misplaced. In that case, the decedent moved in with her sister, Mrs. Weld, who cared for decedent during the last days of her life. (*Id*. at pp. 813-815.) Upon learning that decedent was terminal, Mrs. Weld contacted the Welds' family attorney, saying that decedent wished to make a will leaving all of her property to Mrs. Weld. (*Id.* at p. 814.) Although decedent was able to talk on the telephone, she did not. Further, she was "deprived . . . of any independent advice." (*Ibid*.) The attorney for the Welds prepared a "'death-bed will,'" which he presented to decedent, who was bedridden. (*Id.* at pp. 814-815.) Mrs. Weld was the sole beneficiary of the will. (*Ibid*.) In contrast to *Estate of Davison*, here, Eileen was not presented with a "death bed will"; rather, her testamentary intentions were made clear to her financial advisors and lawyers as early as 1991 and continuing through the drafting of the Trust in 2008. The amendment did not change the guidelines for

18

distribution of her estate upon her death; rather, it assured that her estate would be distributed pursuant to her stated intent in 2008.

On this admission, we conclude the trial court erred in finding that plaintiffs had a reasonable basis for their denial that Eileen was not unduly influenced by Leonard. Failure to award Leonard expenses incurred in proving that he did not unduly influence her is an abuse of discretion.

### E. Burden of Demonstrating Costs-of-Proof

In their responding brief, plaintiffs contend that we should affirm the trial court's order denying Leonard's section 2033.420 motion on the grounds "his request for some $1.5 million in attorneys' fees and costs as sanctions" was not supported by any declarations that identified "with any particularity the expenses they claimed were incurred in proving the issues discussed above . . . ." Recognizing that the trial court did not rule on this ground, plaintiffs' argue that Leonard's "counsel's declarations plainly are not sufficient to support a Section 2033.420 sanctions award." Leonard replies by pointing out his counsel's declaration, which specified the areas of work performed for various billing periods, such as reviewing plaintiffs' handwriting expert's work, deposing percipient witnesses, and researching testator's susceptibility to undue influence and mental capacity. Logically, if Leonard had succeeded in his motion, he would have recovered all of the amount requested. Because we have reversed in part and affirmed in part the trial court's order, we must remand for a determination of the amount of sanctions to be awarded. On remand, Leonard is directed to identify with particularity

19

the expenses incurred in proving the issues which we have concluded plaintiffs unreasonably denied, including, requests for admission Nos. 3, 7, 8, and 10.

## IV.  DISPOSITION

We reverse the order of January 24, 2013, which denied appellant costs and fees under section 2033.420 as to requests for admission Nos. 3, 7, 8, and 10.  In all other respects, we affirm the order.  We remand the matter to the trial court to determine the amount of costs and fees appellant should be awarded.  Appellant Leonard M. Tweten shall recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

MILLER
J.

20